# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **AARON MICHAEL ROGERS,** | § | |
| | § | |
| *Plaintiff,* | § | **SA-16-CV-01171-FB-ESC** |
| | § | |
| **vs.** | § | |
| | § | |
| **RUSTY HIERHOLZER, KERR** | § | |
| **COUNTY SHERIFF, SYLVIA** | § | |
| **FORAKER, KERR COUNTY JAIL** | § | |
| **ADMINISTRATOR, and DR. GLEN** | § | |
| **SMITH, KERR COUNTY JAIL** | § | |
| **DOCTOR,** | § | |
| | § | |
| *Defendants.* | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendants Sheriff W.R. "Rusty" Hierholzer and Jail Administrator Sylvia Foraker's Motion for Summary Judgment [#70] and Defendant Glen Smith, M.D.'s, Motion for Summary Judgment [#71]. Also before the Court are Plaintiff Aaron Michael Rogers's Response to Defendant Dr. Smith's Motion for Summary Judgment [#72], Plaintiff's Response to Defendants Hierholzer and Foraker's Motion for Summary Judgment [#74], Defendant Dr. Smith's Reply in Support of His Motion for Summary Judgment [#78], and Defendants Hierholzer and Foraker's Reply in Support of Their Motion for Summary Judgment [#79]. On January 17, 2017, the Honorable Fred Biery referred all pre-trial proceedings in this case to the undersigned for disposition pursuant to Rule 72 of the Federal Rules of Civil Procedure and Rules CV-72 and 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. The undersigned has authority to enter this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set

forth below, it is recommended that Defendants Hierholzer and Foraker's Motion for Summary Judgment and Defendant Dr. Smith's Motion for Summary Judgment be **GRANTED.**

## I.  Procedural Background

This case involves a challenge by Plaintiff Aaron Michael Rogers ("Rogers") to his conditions of confinement at the Kerr County Detention Center in Kerrville, Texas.  Plaintiff was a pre-trial detainee at Kerr County Jail from October 23, 2016 to May 24, 2017, at which time he was transferred to a Texas Department of Criminal Justice facility.  Rogers, originally proceeding *pro se*, filed a civil rights complaint against Defendants Kerr County Sheriff W.R. "Rusty" Hierholzer ("Hierholzer"), Kerry County Jail Administrator Sylvia Foraker ("Foraker"), and Glen Smith, M.D. ("Dr. Smith") (collectively, "Defendants") [#1].  The Court subsequently appointed an attorney to represent Rogers [#28], who then filed an amended complaint [#34].  Defendants now move for summary judgment [#70, #71], and their motions are ripe for review.

## II.  Facts Established by the Summary-Judgment Record

The summary-judgment record, with disputed facts construed in Rogers's favor, establishes these facts.  Rogers was a pre-trial detainee at Kerr County Detention Center in Kerrville, Texas, from October 23, 2016 to May 24, 2017, at which time he was transferred to a Texas Department of Criminal Justice facility.  On December 22, 2015, Rogers intentionally shot himself in the face with a .357 Magnum revolver, causing serious injury to his face and jaw. ([#74-7] at 2.)  Rogers was treated at the San Antonio Military Medical Center ("SAMMC"), where doctors repaired his jaw with a titanium prosthesis held together by wires on the top and bottom of his gums to hold his teeth in place.  (*Id.*)  Rogers was discharged from SAMMC on January 14, 2016.  ([#71-5] at 78.)  In February 2016, Rogers returned to SAMMC for a follow-up appointment.  ([#74-7] at 4–6.)  The medical team that treated Rogers decided to leave the

titanium prosthesis in place for the time being and advised Rogers to make another follow-up appointment. (*Id.* at 5–6.)

On October 23, 2016, Rogers was arrested for violating his parole by failing to report to his parole officer and two counts of unlawful possession of a firearm by a felon. ([#74-1] at 2.) He was transported to and held at Kerr County Jail. (*Id.*) Kerr County contracts with Correct Care Solutions ("CCS") to provide medical care for the inmates at Kerr County Jail. (Oral Dep. of W.R. "Rusty" Hierholzer ("Hierholzer Dep.") [#70-1] at 24–30.)

Upon arrival, Rogers was evaluated by medical personnel and reported that he had a current painful dental condition or dental complaint. ([#71-5] at 27.) Medical staff noted that Rogers had been shot in the face and that he suffered from bipolar disorder, depression, and anxiety. (*Id.* at 27.) Rogers reported that the wires that held his titanium prosthesis together had loosened and were cutting into his gums, causing him face and jaw pain, which he rated as "8/10." (*Id.* at 27–28.) Rogers also reported that he had been prescribed Hydrocodone for pain and that he had been or was currently on the following psychotropic medications: Prozac, Risperdal, Lithium, Trazadone, and Seroquel. (*Id.*)

On October 25, 2016, Rhonda Maurer, a nurse practitioner who supervises the nursing staff at Kerr County Jail, evaluated Rogers. ([#71-7] at 92–97.) Rogers informed Maurer that his last visit to a maxillofacial surgeon was in February 2016 and that he was supposed to have a follow-up appointment in March 2016. (*Id.* at 93–95.) Maurer documented that the gunshot wound on Rogers's jaw was "very concerning with obvious bone exposure." (*Id.* at 96.) Maurer further reported that she planned to see if Rogers could "bond out" so that he could follow up with his surgeons. (*Id.*) Maurer prescribed Lithium and Cymbalta to treat Rogers's bipolar disorder, Motrin and Tylenol to help Rogers manage his pain, melatonin to treat Rogers's

insomnia, and wax to coat the wiring in his jaw. (*Id.*) Maurer also ordered that Rogers be placed on a soft diet. (*Id.*) On October 26, 2016, a nurse ordered X-rays to be taken of Rogers's chest and right mandible to rule out tuberculosis and osteomyelitis, respectively. (*Id.* at 89.)

On October 30, 2016, Rogers informed jail officials that he had pulled a bone fragment from his mouth. (*Id.* at 88.) A nurse removed the fragment, cleaned the wound area, administered an antibiotic, and covered the wound with a large bandage. (*Id.*) Rogers told the nurse that he was afraid that the wound would become infected and requested that he be hospitalized. (*Id.*) On November 1, 2016, Rogers requested Ensure (a nutritional supplement) with his meals. (*Id.* at 102.) Maurer was notified and ordered that Rogers receive Ensure at least three times a day. (*Id.*) She also instructed the nursing staff to monitor Rogers's weight and set up an appointment with a maxillofacial surgeon as soon as possible. (*Id.*) On November 2, 2016, Rogers requested that he be prescribed Hydrocodone, but was informed that Hydrocodone was not a medication that Kerr County Jail prescribed. ([#71-5] at 18.)

On November 4, 2016, Rogers was examined by Maurer for a second time, after which Maurer ordered several tests for Rogers, including a complete blood count, a comprehensive metabolic panel, an erythrocyte sedimentation rate, a c-reactive protein test, and a thyroid-stimulating hormone test. ([#71-7] at 103.) On November 7, 2016, Rogers complained that the wires in his mouth were cutting his cheeks. ([#72-1] at 14.) On November 8, 2016, Maurer consulted with Dr. Smith, who advised that Rogers could be prescribed Hydrocodone and that Rogers needed to be seen by an oral maxillofacial surgeon as soon as possible. ([#71-7] at 82.) Maurer noted that, because Hydrocodone is an opioid pain reliever, the jail administration would

have to approve its administration to Rogers. (*Id.*) The next day, Taylor Paxson[1], LVN, the Health Service Administrator at Kerr County Jail, asked Maurer to complete an outpatient referral form for Rogers. ([#71-5] at 73.) Per Kerr County Jail's policies and procedures, "[i]nmates are responsible for dental expenses unless indigent." ([#71-2] at 4.)

On November 10, 2016, Rogers submitted a "Healthcare Request" form in which he complained of being in "constant pain" and indicated that he no longer wanted to take Cymbalta, Tylenol, or ibuprofen. (*Id.* at 15.) Rogers also told a nurse that he wanted to stop taking his prescribed medications and, when asked why, explained, "Because it will look better when I sue." ([#71-7] at 80.) That same day, Maurer advised the nursing staff that, based on discussions with Dr. Smith and Ronald Salik, M.D., the Regional Medical Director and Dr. Smith's supervisor, Rogers would not be prescribed Hydrocodone because his laboratory tests did not indicate infection or inflammation, his injury was not acute, and his activities and their objective observations did not indicate a level of pain that would warrant medications other than Tylenol or Motrin. (*Id.* at 104.) On November 11, 2016, Rogers refused Motrin. ([#71-5] at 37.) On November 12, 2016, Rogers refused Lithium and Ensure, as well as a nurse's offer of dental wax to coat the wiring in his jaw. ([#71-7] at 72.) It was also noted that Rogers had manipulated his dental braces and that the wires along his inner cheeks had been bent to point directly into the cheek tissue. (*Id.* at 78.)

On November 17, 2016, Rogers met with Foraker and Paxson to discuss his medical concerns. (*Id.* at 68–71.) At that time, Paxson informed Rogers that it had been noted that he had refused to take some pain medications. (*Id.* at 70.) Paxson also explained to Rogers that Maurer had discussed his medical situation with Drs. Smith and Salik and that they agreed that

---

[1] Taylor Paxson was formerly known as Taylor Hensley and is identified as such in some of Rogers's medical records.

Rogers should not be prescribed Hydrocodone at that time. (*Id.* at 68.) Rogers then requested that he be seen by an oral maxillofacial surgeon to have the wires in his mouth removed and receive a bone graft, but Paxson informed him that his laboratory tests did not indicate infection or inflammation and that his condition was not an emergency. (*Id.* at 68–69.)

On November 30, 2016, Rogers refused Tylenol and Ensure and complained of a foul taste in his mouth for the past three days. (*Id.* at 65.) When asked why he had not informed medical staff sooner, Rogers responded, "I will do whatever it takes to get an infection and get all this taken out of my mouth." (*Id.*) On December 2, 2016, when a nurse presented Rogers with some paperwork to fill out so that his indigent status could be determined, Rogers refused, stating, "[m]y court case has gone through and been filed, so I am going to be suing you all for everything I need." (*Id.* at 64.) On December 3, 2016, Rogers complained that he was having difficulty sleeping at night and that he "need[ed] better meds." ([#72-1] at 16.) On December 4, 2016, Rogers requested that a "real dentist" look at his mouth as soon as possible. (*Id.* at 18.) On December 11, 2016, Rogers indicated that he was having trouble chewing and swallowing his food and that his tongue was "tearing away" from his jaw. (*Id.* at 17.)

On December 13, 2016, Rogers met with Maurer to discuss his jaw issues. ([#71-7] at 58.) Maurer examined Rogers's mouth and jaw and noted: "There is no change from my previous exam. No redness, inflammation, or lesions to gums or mucus membranes noted. No lymphadenopathy. Swelling to right cheek/jaw is unchanged. No reports of fever. No swallowing problems." (*Id.*) Maurer indicated that Rogers would continue to be prescribed Motrin and Tylenol to relieve his pain, as well as Ensure three times a day. Maurer also ordered that Rogers be prescribed Orajel (an antiseptic mouth sore rinse) three times a day. (*Id.*)

On December 27, 2016, Rogers stated that one of his wisdom teeth was causing him "excruciating pain" and needed to be pulled, but, upon examination, Maurer believed that the condition of the tooth in question was not emergent or urgent and that immediate extraction was not required. ([#71-5] at 10–11.) On January 7, 2017, Rogers submitted a Healthcare Request form in which he wrote, "Please kill me already! I'm sick and tired of being in pain due to my top left wisdom tooth." ([#71-6] at 4.) On January 10, 2017, Maurer examined Rogers and reported that:

> Oral exam revealed moist pink mucus membranes without lesions. Chronic swelling to right lower jaw is not as pronounced today. The right lower jaw defect is unchanged and there is no inflammation or s/s of infection noted at this time.

> I note the 3rd molar to upper left jaw has broken off and only a small portion of the crown remains. There is no swelling, redness or drainage to this area. Pain noted when tooth was touched with tongue blade.

> IM has been on tylenol [sic] and motrin [sic] for chronic jaw pain. There is no evidence of infection at this time and pain management is the only intervention indicated.

> IM stated his family would be willing to make payment arrangements with a dentist for extraction of the tooth. IM stated the chronic pain he has to the right lower jaw is manageable and he is able to use wax on the wires to prevent cutting the inside of his mouth. However, he states he is having difficulty managing the acute pain from the broken tooth.

> I advised him to have his family talk with medical staff regarding arrangements for dental extraction.

> I will call Dr. Altgelt to see if he would be able and willing to extract this tooth given IM's history of GSW to the face/mouth which has distorted the normal anatomy of his jaw and mouth.

> Will continue motrin [sic] and tylenol [sic] as prescribed.

([#71-7] at 54–55.)

On January 11, 2017, Rogers completed an Application for Health Care Assistance, which was sent to the Kerr County Indigent Health Care Program. ([#71-8] at 1–14.) Rogers's application for County Indigent Health Care Program benefits was denied because his commissary accounts put him over the income limit. (*Id.* at 16.) On January 14, 2017, Rogers submitted a Healthcare Request form in which he requested a liquid diet because he was "unable to eat the trays that are served due to my life-threatening gunshot wound that's going untreated." ([#71-6] at 6.) On January 17, 2017, Rogers submitted another Healthcare Request form in which he stated, "I need to be seen immediately! I just felt something tear in my mouth, and tasted blood. I can now see a piece of bone sticking out! And it's hurting me bad." ([#74-1] at 20.) On January 19, 2017, Rogers submitted yet another Healthcare Request form in which he indicated that he was going on a hunger strike and requested that he be taken to a hospital to have a bone graft. ([#71-6] at 11.)

On January 25, 2017, Rogers was seen by James Lussier, DDS, an oral maxillofacial surgeon. (*Id.* at 19.) Dr. Lussier's examination revealed an erythematous right submandibular indentation with an orocutaneous fistula and non-restorable decayed teeth. (*Id.*) Dr. Lussier recommended an examination under anesthesia, removal of Rogers's Erich arch bars, extraction of the three decayed teeth, exploration of the posterior right mandible for failed or loose hardware screws, and, if a fistula was present, fistula removal and closure. (*Id.*) Dr. Lussier informed Maurer that Rogers's two most pressing issues were subjective pain and probable infection to the right mandible and that the latter should be addressed "sooner rather than later." ([#71-7] at 115.) Dr. Lussier also noted that Rogers's presentation and objective indicators of pain were not consistent with his subjective complaints of pain and recommended that he not be prescribed an opioid analgesic. (*Id.*) Dr. Lussier further noted that medical staff should conduct

another round of laboratory tests, which Maurer then ordered. (*Id.* at 115, 118.) Finally, Dr. Lussier informed Maurer that Rogers refused treatment because he did not want Kerr County Jail to have access to his medical records from Dr. Lussier. (*Id.* at 115.). Maurer informed Paxson of Rogers's refusal and expressed her opinion that, if Rogers does not want Kerr County Jail to have access to his medical records from Dr. Lussier, Rogers's family should pay for any dental treatment provided to him. (*Id.*)

On February 2, 2017, Rogers submitted a Healthcare Request form in which he claimed to be "in desperate need of hospitalization" and, on February 4, 2017, submitted another Healthcare Request form in which he reiterated that it was "very painful" for him to chew the food that he was being served and requested that he be put on a pureed diet. ([#71-6] at 28, 29.) On February 15, 2017, Rogers refused Tylenol and Motrin. ([#71-7] at 31.) On February 22, 2017, Rogers submitted a Healthcare Request form in which he stated that he had a copy of his medical records from Dr. Lussier and requested immediate transfer to a hospital. ([#71-6] at 34.) The medical staff refused, with Paxson noting that the medical records from Dr. Lussier did not suggest that there was an active infection and that Dr. Lussier did not recommend hospitalization. (*Id.*)

On February 28, 2017, Rogers met with Maurer to discuss Dr. Lussier's recommendations. ([#71-7] at 21–26.) Maurer had previously spoken with Dr. Lussier, who opined that the most appropriate pain medication for Rogers was non-narcotic and recommended Tylenol and ibuprofen, which Maurer ordered as recommended. (*Id.* at 24.) Based on her discussions with Dr. Lussier, Maurer determined that Rogers was not eligible for dental or maxillofacial surgery because there were no signs of an acute infection. (*Id.* at 25.) However, when Rogers arrived for his appointment with Maurer, he asked whether he would be prescribed

Hydrocodone and, upon learning that he would not, demanded to be taken back to his cell and refused all medical treatment. (*Id.* at 21.) At that time, Maurer discontinued Rogers's Tylenol and ibuprofen, as he had refused to take either medication for two days. (*Id.* at 25.)

On March 8, 2017, Paxson asked Dr. Lussier to describe his initial consultation with Rogers and his recommendations for treating Rogers's jaw issues. ([#71-6] at 38–39.) Paxson also asked Dr. Lussier whether Rogers's dental condition was "an emergency situation requiring immediate attention." (*Id.* at 39.) Dr. Lussier responded:

> I am not sure what specifically needs translation. . . . We have spent a lengthy amount of time in various communication at different times with your office and his family/attorney. Let us know if I as a surgeon can offer any surgical services to assist in his care. If your parameters of care are met with the labs taken and do not feel he needs any surgical treatment, ok. If you find he needs surgical treatment, ok. Otherwise, I am not certain I am the right person outside of providing those surgical services.

(*Id.* at 37–38.) On March 10, 2017, a conference call was held between various members of the medical staff, including Paxson and Dr. Salik, and two lawyers for CCS to discuss Rogers's medical status. ([#71-5] at 74.) The participants determined that Rogers's condition was not an emergency and instructed the medical staff to continue to monitor Rogers for signs and symptoms of an infection or worsening condition. (*Id.*) That same day, a nurse reported that Rogers's gums were bleeding because the wires in his mouth were cutting his jaw. ([#71-7] at 3.) Over the next week, Rogers reported pain in his mouth because the wires were "breaking." ([#71-6] at 138.) On March 16, 2017, Rogers stated that he was in pain and needed to be transferred to a hospital, but a nurse did not think that such a transfer was medically necessary. (*Id.* at 140.)

On March 21, 2017, Rogers showed a nurse that he had removed the wires on his upper teeth. (*Id.* at 131.) The nurse examined the area and noticed redness, but no swelling, cuts, or

drainage. (*Id.*) Rogers told the nurse that he planned on removing the wires on his bottom teeth that night. (*Id.* at 133.) The nurse administered Tylenol, Motrin, and Ensure, and Foraker was notified of the situation. (*Id.*) Rogers refused the nurse's request that he be seen by medical staff that night. (*Id.* at 133.) Paxson then contacted Dr. Lussier's office to see if an appointment could be made to remove the remaining wires. (*Id.* at 135–36.) Dr. Lussier's receptionist informed her that she had "gone back and forth" with Rogers's family, but that Dr. Lussier was unsure about operating on Rogers because he had been "suing everyone." (*Id.* at 135.) However, on March 24, 2017, Dr. Lussier agreed to see Rogers again. (*Id.* at 128–30.)

On March 27, 2017, Rogers met with Maurer, who informed him that Kerr County Jail was in the process of setting up an appointment with Dr. Lussier. (*Id.* at 122.) Rogers reported that his mouth felt better, that there was no change in his ability to chew or swallow, and that he did not have a fever. (*Id.*) However, Rogers informed Maurer that he did not want to see Dr. Lussier unless, in addition to the previously recommended dental work, he also received a bone graft. (*Id.* at 122–23.) On March 29, 2017, Rogers spoke with Paxson and Dr. Lussier. ([#70-3] at 1–9.) Dr. Lussier explained to Rogers that a bone graft is a type of reconstructive surgery and that he was a "long way" from needing one. (*Id.* at 1.)

Dr. Lussier operated on Rogers's jaw on April 14, 2017. ([#71-6] at 54–63.) Dr. Lussier removed Rogers's Erich arch bar and extracted the three decayed teeth. (*Id.* at 57.) Dr. Lussier ordered that Rogers be prescribed Amoxicillin, Tylenol, and ibuprofen to manage his pain. (*Id.* at 57, 77.) A follow-up appointment was scheduled for April 19, 2019. (*Id.* at 50, 93.) Later that day, Rogers met with Paxson for post-op instructions and education. (*Id.* at 96–99.) Rogers reported that he was feeling "droopy" and that some of the numbness was starting to wear off, and Paxson noted that there was "a small amount of red blood draining from penrose [sic] drain

which was covered with 2 x 2 gauze and held in place with paper tape." (*Id.* at 96, 97.) Rogers told Paxson that Dr. Lussier had promised that he would be prescribed Hydrocodone, but Paxson showed Rogers the medical records from Dr. Lussier, which did not include an order for Hydrocodone. (*Id.* at 96–97.) Rogers accused Dr. Lussier of lying to him and stated that he would refuse all medications unless he was prescribed Hydrocodone. (*Id.* at 97.) Rogers then told Paxson that he did not want to follow-up with Dr. Lussier to address the Penrose drain and stated that he would "eat right now and do whatever to get an infection." (*Id.* at 99.) Rogers further stated that he would contact his lawyer, claiming, "I know how to play this game!" (*Id.*) Maurer was notified and ordered that Rogers be prescribed Hydrocodone and Motrin to manage his pain and that he be monitored for increased sedation and constipation. (*Id.* at 90, 99.)

On April 18, 2017, Rogers was examined by Maurer. (*Id.* at 86–89.) Maurer noted that Rogers's pain was better controlled with Norco and Motrin and noted that:

> He still has quite a bit of swelling to right cheek and under his lower jaw. Penrose drain is sutured in place to right mandible. There is moderate amount of thick yellow drainage on dressing. It is difficult for him to open his mouth due to the swelling. He states the doctor sutured the inside of his cheek to the gum so he is unable to open his mouth very wide. There is no bloody drainage in his mouth or from the drain. He denies n/v and appetite is fair. He is drinking ensure [sic] and eating Ramon noodle soups. He thinks he has had fever at times, but no chills or muscle plain.
>
> I examined his mouth, but was unable to visualize the right mandible. I see a small amount of thick yellow mucus in his mouth. There is swelling as described above and small palpable right submental lymph nodes.

(*Id.* at 86–87.) Maurer ordered that Rogers's dosage of Norco be increased and that he continue to be prescribed Motrin to control his pain. (*Id.* at 87.) On April 19, 2017, Rogers returned to Dr. Lussier for his scheduled follow-up visit. (*Id.* at 85.) As the medical staff at Kerr County Jail did not receive any new orders or recommendations from Dr. Lussier, they continued to prescribe Rogers pain relievers as previously ordered. (*Id.*)

On May 2, 2017, Rogers met with Maurer and requested that Tylenol with Codeine No. 3 be prescribed. (*Id.* at 81.) Maurer refused, noting that it had been three weeks since the surgery and that his mouth was healing well. (*Id.*) On May 9, 2017, Rogers stated that he was in pain and needed pills, and Maurer prescribed Rogers Tylenol and Motrin. (*Id.* at 80.) On May 11, 2017, Rogers returned to Dr. Lussier for a second follow-up visit. (*Id.* at 233.) Dr. Lussier's treatment notes indicate that he did not observe any drainage, that the orocutaneous fistula had closed, and that Rogers had poor oral hygiene and cold sensitivity. (*Id.* at 73.) Dr. Lussier recommended oral hygiene and elimination of caries (decay) and stated that reconstruction would be considered after those issues were addressed. (*Id.*) Dr. Lussier also informed the medical staff at Kerr County Jail that there was "[n]o indication that pain is sufficient that he would need Tylenol #3 or Hydrocodone" and that they should "[c]ontinue current plan of care." (*Id.* at 76.) On May 15, 2017, Rogers was sent to a Texas Department of Criminal Justice facility. While incarcerated at Kerr County Jail, Rogers was not personally examined by Dr. Smith, as he did not make on-site visits. (Oral Dep. of Rhonda Maurer ("Maurer Dep.") [#72-10] at 26–27.)

There is no evidence in the summary-judgment record that would permit a finding that Hierholzer was personally involved in any of the above-described medical decisions or otherwise responsible for the medical treatment that Rogers received (or did not receive) while incarcerated at Kerr County Jail. On the contrary, Hierholzer testified that:

> [I]t's up to the medical company that this county contracts with to make sure they get adequate and – and appropriate medical care. Now, if it's care that the inmates think they ought to have, that may be different than what they need. But it's up to the medical people, which I'm not one, to make that determination, not me.

(Hierholzer Dep. [#70-1] at 68.)  Foraker similarly testified that CCS was "contracted in and they make the medial decisions.  Since we don't have the license and that is what they do, that has to be their decision on what they do."  (Oral Dep. of Sylvia Foraker [#70-2] at 32.)  Foraker further testified that she was not "going to get in the middle of what they were doing because Aaron was getting the care – the reasonable care that he was needed while he was in here."  (*Id.*)

### III.  Summary-Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995).  The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial.  *See Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).  The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *See Topalian v. Ehrman*, 954 F.2d 1125,

1131 (5th Cir. 1992). The Court will view the summary-judgment evidence in the light most favorable to the non-movant. *See Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174. However, if the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the non-movant's response. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## IV. Analysis

Rogers has sued pursuant to 42 U.S.C. § 1983. A plaintiff can establish a claim under Section 1983 for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law. *See Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). Rogers contends that Defendants violated his constitutional rights by acting with deliberate indifference in denying him adequate medical care. In response, Defendants have moved for summary judgment, arguing that they are entitled to qualified immunity on Rogers' inadequate-medical-care claims. Because Rogers has failed to proffer evidence that would allow a reasonable fact-finder to conclude that Defendants acted with deliberate indifference, Defendants are entitled to qualified immunity and their motions for summary judgment should be granted.

Pre-trial detainees like Rogers enjoy the same rights as convicted prisoners to "constitutional essentials like medical care and safety," but those rights emanate from the Fourteenth Amendment's due process guarantees, not the Eighth Amendment. *See Rogge v. City*

*of Richmond*, 995 F. Supp. 2d 657, 666 (S.D. Tex. 2014); *see also Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (stating that the procedural and substantive due process guarantees of the Fourteenth Amendment provide constitutional protections to pre-trial detainees); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1995) (en banc) (same). The undersigned, therefore, construes Rogers's Section 1983 claims under the Fourteenth Amendment. A "deliberate indifference" standard governs all such claims, regardless of whether they concern a deprivation of "basic human needs, including medical care" or "protection from harm" during confinement. *Rogge*, 995 F. Supp. 2d at 666.

To impose liability on Hierholzer, Foraker, or Dr. Smith (in their individual capacity), Rogers "must establish that the official(s) acted with subjective deliberate indifference to prove a violation of his constitutional rights." *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738–39 (5th Cir. 1997) (affirming summary judgment as to an individual defendant because there was no genuine issue of material fact indicating that he acted with deliberate indifference). Subjective deliberate indifference means that "the official had subjective knowledge of a substantial risk of serious harm to a pre-trial detainee but responded with deliberate indifference to that risk." *Hare*, 74 F.3d at 650.

Deliberate indifference to serious medical needs may be manifested by prison doctors in their response to the prisoner's needs. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). However, unsuccessful medical treatment or disagreement between an inmate and his doctor concerning the manner of treatment does not suffice. *See Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Similarly, claims of inadvertent failure to provide medical care or negligent diagnosis are insufficient to state a claim of inadequate medical care. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991). A claim that

additional diagnostic techniques or forms of treatment should have been utilized is also inadequate for purposes of § 1983. *See Estelle*, 429 U.S. at 107. Finally, if a detainee's pain is the result of his own actions, the detainee will not be able to show that jail officials acted with deliberate indifference. *See McQueen v. Karr*, 54 F. App'x 406, at *1 (5th Cir. 2002).

In this case, Defendants contend that they are entitled to qualified immunity. A government official performing a discretionary function is entitled to qualified immunity unless his actions violate a clearly established right of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where, as here, a defendant invokes qualified immunity in a motion for summary judgment, it is the plaintiff's burden to show that the defendant is not entitled to qualified immunity. *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). That is, the plaintiff must present evidence sufficient to create a genuine dispute of material fact as to whether (1) the official's conduct violated a constitutional right of the plaintiff, and (2) the constitutional right was clearly established so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *See id.*; *Pearson v. Callaha*n, 555 U.S. 223, 232 (2009).

A right is clearly established for purposes of the second step of the qualified-immunity analysis if it would be clear to a reasonable official, at the time of the challenged conduct, that his or her conduct violated the statutory or constitutional right at issue. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001). Stated differently, a right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has repeatedly admonished lower courts not to define clearly established law at a high level of generality. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Rather, the inquiry must be

undertaken in light of the specific factual context of the case. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The dispositive question is "whether the violative nature of particular conduct is clearly established." *Al-Kidd*, 563 U.S. at 742. Lower courts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first. *See Pearson*, 555 U.S. at 236. Here, Rogers has not met his summary-judgment burden to demonstrate that Defendants are not entitled to qualified immunity.

Rogers contends that Defendants violated his constitutional rights by denying him adequate medical care. Specifically, Rogers alleges that Defendants denied him recommended dental treatment for several months, although they were aware of his need for it, and that this delay caused severe physical pain. Rogers further contends that Defendants acted with deliberate indifference in denying his repeated requests for dental treatment.

The Fifth Circuit has specifically identified circumstances where the denial or delay of dental or mental care can rise to the level of a constitutional violation. *See Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) ("A delay in medical treatment that results in substantial harm can constitute deliberate indifference."). In *Carlucci*, the plaintiff alleged that prison officials and medical personnel were deliberately indifferent to his serious medical needs when they denied him recommended dental treatment. *See id.* at 536. The district court dismissed the complaint as frivolous for failure to state a claim. *See id.* at 537. The Fifth Circuit reversed, holding that the plaintiff had stated a plausible claim of deliberate indifference by alleging that his teeth were cracking and breaking, that a prison doctor recommended that a dentist restore his missing bridge and repair his fractured teeth, that he never received such treatment, and that he suffered extreme pain for several months from the cracking of four to five of his teeth. *See id.* at

539 ("Carlucci's allegations of severe physical pain and denial of recommended dental treatment are sufficient to state a plausible claim for relief.").

The Fifth Circuit has indicated that even short delays in the provision of prescribed dental or medical care can suffice to support a claim for deliberate indifference, if the medical needs are serious and the delay results in significant pain and suffering. *See Harris v. Hegmann*, 198 F.3d 153 (5th Cir. 1999). In *Harris*, the plaintiff, a Louisiana state prisoner, alleged that a doctor and two nurses were deliberately indifferent to his serious medical needs. *See id.* at 154. Weeks after surgery on his jaw, doctors removed wires from the plaintiff's jaw; thirty to forty minutes after that procedure, the plaintiff's jaw shifted and "fell out of place," causing him excruciating pain. *Id.* The plaintiff immediately told a corrections officer that his jaw had "slipped" and that he required emergency medical attention, but the officer forced him to return to his cell without treatment. *Id.* Over the course of the next week, the plaintiff made "urgent and repeated requests for immediate medical treatment for his broken jaw and his complaints of excruciating pain" to a doctor and two nurses, who disregarded his complaints. *Id.* at 159–60. Eight days after the plaintiff was forced to return to his cell without treatment, medical providers confirmed that his jaw had rebroken and the plaintiff received the needed surgery to repair his jaw. *See id.* at 155. After considering these factual allegations, the district court dismissed the plaintiff's complaint as frivolous for failing to state a claim upon which relief could be granted. *See id.* The Fifth Circuit reversed, holding that, if the plaintiff's factual allegations were true, they would state a deliberate-indifference claim. *See id.* at 160.

Although Rogers's factual allegations in this case bear some similarity to the allegations in *Harris* and *Carlucci*, the summary-judgment record does not contain evidence that would

allow a reasonable actor to conclude that any of the defendants acted with deliberate indifference. The undersigned considers the evidence with regard to each defendant in turn:

## A.     Dr. Smith

Rogers could establish that Dr. Smith was aware of a substantial risk to his health, satisfying the first part of the deliberate-indifference test. However, Rogers has not proffered evidence that would allow a reasonable fact-finder to conclude that Dr. Smith disregarded the substantial health risk about which he knew. Accordingly, Dr. Smith is entitled to qualified immunity on Rogers's inadequate-medical-care claims and should be dismissed as a defendant.

This case is analogous to *McQueen*. There, the Fifth Circuit affirmed the dismissal of a dental claim similar to Rogers's as frivolous and for failure to state a claim, reasoning that the prisoner's dissatisfaction with the treatment offered him, extraction of his injured teeth versus more expensive restorative treatment, was insufficient to state a claim under Section 1983. *See id.* at \*1. The court explained that "McQueen has no right to the treatment of his choice. Moreover, the complaint makes clear that McQueen's failure to receive the more expensive treatment is due to his own neglect and inability to care for his teeth, not to any deliberate indifference by the defendants." *Id.* District courts have consistently found that offering dental extractions, but not restorative dental care, is constitutionally adequate medical care. *See, e.g.*, *Hale v. Harrison Cty. Bd. of Supervisors*, No. 1:14-CV-61-LG-JCG, 2017 WL 1091269, at \*6 (S.D. Miss. Jan. 31, 2017), *report and recommendation adopted*, No. 1:14CV61-LG-JCG, 2017 WL 1073376 (S.D. Miss. Mar. 21, 2017); *Ball v. Johnson Cty. Jail*, No. 3:03-CV-3056-D, 2004 WL 2338105, at \*2 (N.D. Tex. Oct. 18, 2004).

It follows that, although a jail official's refusal to provide a detainee with recommended dental treatment could amount to deliberate indifference, a detainee's dissatisfaction with a

doctor's recommended treatment and a jail official's consequent refusal to provide non-recommended, alternative treatment options does not. Thus, this case is readily distinguished from *Carlucci*, where the defendants denied the prisoner recommended dental treatment. Here, the summary-judgment record reveals only Rogers's dissatisfaction with the treatment offered him, not a denial of recommended dental care. Rogers initially refused Dr. Lussier's recommended treatment because he wanted a bone graft (and because he did not want Kerr County Jail to have a copy of his medical records from Dr. Lussier). ([#71-7] at 115.) Dr. Lussier believed that a bone graft was impractical because it is a restorative procedure and told Rogers that he was a "long way" from needing one. ([#70-3] at 1.) Dr. Lussier is a licensed dentist and is competent to make such a medical assessment. Rogers eventually agreed to Dr. Lussier's treatment plan, and Dr. Lussier operated on Rogers's jaw. ([#71-6] at 54-63.) The procedure was successful. (*Id.* at 57.) Rogers was then prescribed pain medication, including Hydrocodone, Norco, Amoxicillin, Tylenol, Motrin, and ibuprofen. (*Id.* at 57, 77, 90, 99.) Rogers also received post-op instructions, education, and treatment at Kerr County Jail. (*Id.* at 96-99.)

There is no doubt that Rogers suffered pain as a result of his condition, but "[t]he constitution does not . . . guarantee pain-free medical treatment," *Rochell v. Corr. Med. Servs.*, No. 4:05CV268-P-A, 2006 WL 1422988, at *4 (N.D. Miss. Apr. 10, 2006), *report and recommendation* adopted, No. 4:05CV268-P-A, 2006 WL 1423189 (N.D. Miss. May 16, 2006), and Rogers was provided with medication for his pain. Also, the record indicates that Rogers was at least partially responsible for his own pain and suffering, as he repeatedly refused pain medication ([#71-5] at 37; [#71-7] at 21, 25, 31, 65, 72.); refused to fill out paperwork so that his indigent status could be determined ([#71-7] at 65); told medical staff that he was trying to get an

infection (*Id.* at 65); refused treatment when he first met with Dr. Lussier (*Id.* at 115, 118); and removed the wires on his upper teeth and refused a nurse's request that he be seen by medical staff ([#71-6] at 131, 133).

Rogers complains that he was not prescribed appropriate pain relievers, particularly Hydrocodone, which he had been prescribed before he was incarcerated at Kerr County Jail. ([#71-5] at 28.) Upon arriving at Kerr County Jail, Rogers was prescribed Motrin and Tylenol to manage his pain, as well as wax to coat the wiring in his jaw. On November 8, 2016, Dr. Smith advised Maurer that Rogers could be prescribed Hydrocodone and that he needed to be seen by an oral maxillofacial surgeon as soon as possible. ([#71-7] at 82.) In response, Maurer noted that, because Hydrocodone is an opioid pain reliever, the jail administration would have to approve its administration to Rogers. (*Id.*) However, on November 17, 2016, Rogers was informed that Dr. Smith, Dr. Salik, and Maurer had collectively agreed that he should not be prescribed Hydrocodone because his laboratory tests and their objective observations did not indicate a level of pain that would warrant medications other than Tylenol or Motrin, which he had already been prescribed. (*Id.* at104.) The decision whether to prescribe Rogers additional pain relief medication "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. The Fifth Circuit has clarified that "[n]either the fact that [a detainee] continued to experience pain despite the treatment afforded him nor the fact that doctors refused to provide him with the specific pain killers he requested is sufficient to constitute a violation of his Fourteenth Amendment rights." *Williams v. Chief of Med. Operations, Tarrant Cty. Jail*, 44 F.3d 1004, 1994 WL 733493, at *2 (5th Cir. 1994).

Rogers may disagree with Dr. Smith's medical opinion that Rogers should not be prescribed an opioid analgesic, but the record does not demonstrate that Dr. Smith has engaged

in conduct that would clearly evince a wanton disregard for Rogers's serious medical needs. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."); *see also Garza v. Lovington*, No. 5:16-CV-280-BQ, 2017 WL 3475686, at *3 (N.D. Tex. July 18, 2017), *report and recommendation adopted*, No. 5:16-CV-280-C, 2017 WL 3475679 (N.D. Tex. Aug. 11, 2017) ("[A]lthough Garza may have desired different, or more expedient, treatment, the facts he has alleged fail to demonstrate Defendants ignored or otherwise refused to treat a serious medical need."); *Rochell*, 2006 WL 1422988, at *4 ("While the plaintiff might have preferred stronger medication, his mere disagreement with his medical treatment does not state a constitutional claim. Indeed, prison doctors are understandably hesitant to prescribe powerful narcotics to prisoners except when absolutely necessary."). Furthermore, after his surgery, Rogers was, in fact, prescribed Hydrocodone to manage his pain. ([#71-6] at 99.)

Rogers suggests that Dr. Smith was deliberately indifferent to his serious medical needs because he did not personally examine him. But Rogers has cited no authority to support his position that Dr. Smith's failure to personally examine him constituted deliberate indifference to his serious medical needs. In fact, Maurer testified that Dr. Smith did not make on-site visits; instead, Maurer would contact Dr. Smith to discuss an inmate's treatment and Dr. Smith would suggest a course of treatment. (Maurer Dep. [#72-10] at 26-27.) Maurer further testified that she discussed Rogers's treatment with Dr. Smith on at least three separate occasions, but that she did not ask Dr. Smith to personally examine Rogers. (*Id.* at 53-54, 60-61.) Dr. Smith responded to each request for consultation with his recommendations for Rogers's treatment. (*Id.* at 60-61.) In addition, the record reflects that Rogers was routinely examined and treated by the nursing

staff at Kerr County Jail, and there is no evidence that he was ever denied sick call or that one of his many Healthcare Requests forms went unresponded to, even if Rogers was dissatisfied with the response.

In sum, Dr. Smith is entitled to qualified immunity because Rogers has not met his burden to produce evidence that would allow a reasonable fact-finder to conclude that he acted with deliberate indifference to his serious medical needs or otherwise violated his clearly established constitutional rights.

## B.     Hierholzer and Foraker

To the extent Rogers alleges that Hierholzer and Foraker were deliberately indifferent to his serious medical needs, such claims must also be dismissed.  The summary-judgment record does not demonstrate that Hierholzer or Foraker had personal involvement in Rogers's medical evaluation and treatment.  On November 17, 2016, Rogers met with Foraker and Paxson to discuss his medical concerns.  ([#71-7] at 68-71.)  At that meeting, Paxson explained to Rogers that Dr. Smith, Dr. Salik, and Maurer had discussed his condition and determined that it was not an emergency and that, therefore, he should not be prescribed Hydrocodone.  (*Id.* at 68-69.) Foraker was also notified when Rogers removed the wires on his upper teeth and claimed that he was going to remove the wires on his bottom teeth as well.  ([#71-6] at 133.)

But the record is bereft of any evidence that Foraker personally intervened in any of the above-described medical decisions, denied Rogers recommended medical care, or was otherwise responsible for the delay in treatment.  Likewise, there is no evidence in the summary-judgment record that would permit a finding that Hierholzer was personally involved in Rogers's medical care or was responsible for the treatment that Rogers received (or did not receive) while incarcerated at Kerr County Jail.

And there is even less evidence to support a claim against Hierholzer, individually. Hierholzer's general statement that he is "ultimately responsible for the welfare and well-being" of the inmates at Kerr County Jail does not establish that he was personally involved with Rogers's treatment or was deliberately indifferent to problems with his face and jaw. (Hierholzer Dep. [#70-1] at 41.) In sum, Foraker and Hierholzer are also entitled to qualified immunity because Rogers has not met his burden to produce evidence that would allow a reasonable fact-finder to conclude that they violated his clearly established constitutional rights.

## C.    Kerr County

Kerr County has also moved for summary judgment. Rogers's Amended Complaint does not name Kerr County as a party; rather, Rogers appears to be suing Defendants in their individual capacities only, and his responses to the summary-judgment motions do not indicate that he intended to sue the County itself. But to the extent he is suing Defendants in their official capacities, those claims are tantamount to claims against the County. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "To succeed in holding a municipality liable, the plaintiff must demonstrate a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights.'" *Olabisiomotosho*, 185 F.3d at 526 (quoting *Hare*, 74 F.3d at 649 n.14). The undersigned has already concluded that Rogers has not met his summary-judgment burden to produce evidence that any County employee acted with deliberate indifference. This failure would also be fatal to any claims that he is asserting against the County (or Defendants in their official capacity). Moreover, Rogers has not alleged that Defendants implemented an

unconstitutional policy that led to his injury. Accordingly, Rogers's municipal liability claim fails.

In sum, Rogers has not proffered evidence that would allow a reasonable fact-finder to conclude that any of the defendants in this case acted with subjective deliberate indifference to his serious medical needs or otherwise violated his constitutional rights. Therefore, Defendants are entitled to qualified immunity on Rogers's inadequate-medical-care claims and their summary-judgment motions should be granted.

## V. Conclusion and Recommendations

Having considered the motions, the responses and replies thereto, the attached exhibits and declarations, and the remainder of the record, the undersigned recommends that Defendants Sheriff W.R. "Rusty" Hierholzer and Jail Administrator Sylvia Foraker's Motion for Summary Judgment [#70] and Defendant Glenn Smith, M.D.'s, Motion for Summary Judgment [#71] be **GRANTED.**

## VI. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Report and Recommendation must be filed within fourteen (14) days after being served with a copy of same, unless this time period is modified by the district court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the

district court need not consider frivolous, conclusive, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a de novo determination by the district court. *See Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 8th day of August, 2019.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE